# UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 04-76913-SCS |
| ANDREW C. HECKER, | ) | |
| | ) | |
| *Debtor.* | ) | |
| | ) | |
| | ) | |
| CHRISTINA L. HECKER, | ) | |
| | ) | |
| | ) | APN 05-7021-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW C. HECKER, | ) | |
| | ) | |
| | ) | Chapter 7 |
| *Defendant.* | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial on September 20, 2005, upon the Complaint to Determine Dischargeability of Debt under § 523(a)(5) of the Bankruptcy Code. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and the pleadings submitted, the Court makes the

following findings of fact and conclusions of law.

I.

PARTIES AND PROCEDURAL HISTORY

Andrew C. Hecker ("Hecker") filed under Chapter 7 of the Bankruptcy Code on

November 29, 2004.  The debtor's former wife, Christina L. Minton (formerly Hecker)

("Minton"), filed an adversary complaint (the "Complaint") to determine the dischargeability

of certain debts owed to her by Hecker.  The parties agreed to stipulate the majority of the

counts in the Complaint.  Only Count III of the Complaint was tried before this Court.[1]

Count III addresses the dischargeability of a $19,000.00 lump sum payment the parties

agreed to as part of the Stipulation and Agreement[2] and incorporated by addendum into the

divorce decree.  Minton voluntarily dismissed her 11 U.S.C. §523(a)(15) claims;[3] therefore,

this Court is only considering the 11 U.S.C. §523(a)(5) claim regarding the $19,000.00 lump

sum.

---

[1] Prior to trial Minton, with the consent of Hecker, dismissed Counts II, IV, VI and IX of
her Complaint.  At trial, both parties stipulated to Counts I, V, VII, and VIII.  Therefore, Count
III, the "non-dischargeability of the $19,000 lump sum payment, and accrued interest, pursuant to
11 U.S.C. §523(a)(5)" was the only Count which was not dismissed or stipulated to by the
parties.

[2] Unless otherwise specified, all references herein to specific paragraph numbers
reference paragraphs of the Stipulation and Agreement dated December 3, 2002 and admitted at
trial as Plaintiff's Exhibit 1 (the "Stipulation Agreement").

[3] On July 7, 2005, Michael L. Donner, counsel for Minton, filed with this Court a
"Stipulation of Dismissal of Counts II, VI, IX of the Plaintiff's Complaint."  Counts II, IV, VI,
and IX all referred to 11 U.S.C. §523(a)(15) claims.  In the Stipulation Order, Minton, with the
consent of Hecker, dismissed said Counts of her Complaint with prejudice.

II.
## FINDINGS OF FACT

Hecker and Minton were married on June 14, 1986. Three children were born of the marriage. Ultimately marital difficulties arose, and the parties separated in November 1998. Eventually, the parties entered into a "Stipulation and Agreement" dated December 3, 2002 (the "Stipulation Agreement"), which set out the obligations and duties of the parties in regard to the children, spousal support, and property division. Pl. Ex. 1. At the time of signing the Stipulation Agreement both parties were represented by counsel; Kristen M. Smith served as counsel for Hecker, and W. Brantley Basnight was counsel for Minton. Both Hecker and Minton testified that they signed the Stipulation Agreement willingly and that there was no threat or duress. The Circuit Court for the City of Chesapeake, Virginia entered a decree of divorce on June 4, 2003 (the "Divorce Decree"). Pl. Ex. 2. The Divorce Decree ratified and incorporated the Stipulation Agreement.

Sometime during the course of Hecker and Minton's marriage, the parties acquired property in both Maryland and Virginia. At the time the parties separated in 1998, Minton was a stay at home mother, and Hecker was a partner in a management consulting business where he was making a low six figure income. As part of the separation, Minton continued to reside in the family residence in Virginia with the children, and Hecker moved out of the house. At that time, Hecker agreed to pay Minton $6,000.00 per month in pendente lite child and spousal support, of which $4,000.00 was to be considered spousal support, and $2,000.00 for child support.

3

At some point between the parties' separation in 1998 and the signing of the

Stipulation Agreement in December 2002, Hecker fell into arrears in his child and spousal

support payments. He testified that he fell behind in his payments because his management

consulting business began suffering cash losses and started to miss payroll payments. In

addition, prior to the execution of the Stipulation Agreement, the Virginia residence was

refinanced in Minton's name only, and the Maryland property was sold. The proceeds from

the sale of the Maryland property, approximately $94,000.00, were deposited into a bank

account at BB&T that was solely in Minton's name and to which only Minton had access.

Minton testified that she used the proceeds to pay off some of Hecker's debts. She also

testified that around the time of the Stipulation Agreement,[4] she transferred approximately

$44,000.00 of the funds to Hecker. Minton allegedly wrote Hecker one check for $23,802.00

on or about November 22, 2002, and she wrote him another check for $20,600.00 on or about

December 5, 2002. Hecker testified he used the proceeds Minton gave him to pay child

support and to purchase a piece of investment property. It is unclear why Minton transferred

such a substantial amount of the proceeds to Hecker when arrearages existed; however,

Minton testified that she used some of the proceeds to pay herself part of the child and

spousal support arrears that Hecker owed to her. To this end, Minton wrote a check from the

---

[4] The Stipulation Agreement is dated December 3, 2002, but the notarial for Hecker
indicates his execution on December 11, 2002 and the notarial for Minton indicates her execution
on December 23, 2002 [hereinafter Execution of Stipulation Agreement].

account payable to herself in the amount of $19,391.00 (the "$19,391.00 Payment").[5] Minton

further testified that when she wrote the check, Hecker owed her approximately $45,000.00

in child and spousal support arrears. Hecker admitted arrearages and testified that there were

months when he paid $4,500.00, instead of the $6,000.00 the parties agreed to, but he

disputed that the alleged amount of support arrears that accumulated before the Stipulation

Agreement was $45,000.00.

The Stipulation Agreement was entered into in December, 2002.[6] The Stipulation

Agreement provided for various forms of support, property division, and shared financial and

care-giving responsibility for the children. Pl. Ex. 1. As part of the Stipulation Agreement,

in paragraph 1, both parties waived any right to spousal support. In paragraph 4, Hecker

agreed to pay Minton "$2,500.00 per month on or before the first of each month,

commencing with the month of December 2002, as child support for the care and

maintenance of said minor children of the marriage." Paragraph 6 of the Stipulation

Agreement addressed uninsured medical and dental expenses, of which Hecker agreed to

share financial responsibility with Minton, with each to pay 50% of those expenses. In

addition, in paragraph 10, Hecker agreed to pay Minton "the lump sum of $19,000.00 on or

before January 22, 2003, [and] [t]hat if the subject amount ($19,000.00) is not paid by

---

[5] Minton's testimony is unclear as to when the check representing the $19,391.00 payment was made; however, her testimony indicates that the payment was made around the same time as the Stipulation Agreement.

[6] *See* Execution of Stipulation Agreement, *supra* note 4, at 4.

Husband to Wife by said date, or if any portion remains unpaid by said date, then the amount remaining unpaid will accrue interest, in Wife's behalf, at a rate of 9% per annum until paid" (the "Lump Sum Payment"). Paragraph 10 of the Stipulation Agreement also required Hecker to be financially responsible for any and all attorneys' fees and court costs incurred by Minton in the collection process of the Lump Sum Payment. Additionally, paragraph 10 included language referencing bankruptcy, and provided that "said financial responsibility by Husband for the payment of the subject lump sum of $19,000.00 is a financial obligation which will not be dischargeable by Husband in bankruptcy, and which is herewith specifically included by the parties within the intent and application of the provisions contained within Section 18, as hereinafter set out."[7]

Another provision of the Stipulation Agreement also addressed child and spousal support. In paragraph 14 of the Stipulation Agreement, Hecker and Minton agreed that Hecker would pay and Minton would accept "immediate payment by Husband of the lump sum of $26,000.00 in full satisfaction of the existing pendente lite child and spousal support arrearage claims by Wife against Husband." The parties also agreed in paragraph 14 that the payment of the $26,000.00 would "be regarded solely as child support, said sum being non-taxable to Wife, and non tax-deductible by Husband." Further, paragraph 14 referenced

---

[7] Paragraph 18 provided, in part, "the parties mutually covenant, represent, warrant, and agree that it is their mutual intent and bargain ... monetary payments and obligations set forth herein shall be considered, for the purposes of federal bankruptcy laws, exempt from discharge and nondischargeable in bankruptcy as debts to a spouse, former spouse, or child of the obligor, for alimony to, maintenance for, or support of a spouse, former spouse, or child as actually being in the nature of alimony ...."

paragraph 8, which discusses the proceeds from the Maryland property. Paragraph 8 states, in part, "[t]he parties agree that Wife will forthwith disburse from the subject proceeds monies sufficient to satisfy Husband's monetary obligations as hereafter set forth within ... Section 14 ($26,000.00) of this Agreement. That, further, within two business days after the execution of this Agreement by both parties, Wife will forthwith disburse directly to Husband the monetary proceeds existing in the subject account after the disbursements by Wife as prescribed herein."

Minton testified that she agreed to accept the $19,391.00 Payment in place of the $26,000.00 mentioned in paragraphs 8 and 14 of the Stipulation Agreement. She claims that, as part of agreeing to accept the $19,391.00 Payment in lieu of the $26,000.00 payment provided in paragraphs 8 and 14 of the Stipulation Agreement, she was to also receive the $19,000.00 lump sum payment set out in paragraph 10 of the Stipulation Agreement by January 2003. Minton testified that the $26,000.00 and the $19,000.00 were supposed to cure the $45,000.00 support arrears that she alleges Hecker owed her. Hecker, while admitting he owed the $26,000.00 in support arrears, at the time of the execution of the Stipulation Agreement, disputed that he owed $45,000.00 for support arrears, and testified that it was his recollection that the $26,000.00 recited in paragraph 14 of the Stipulation Agreement covered all the past due support arrears owed at that time as provided in the Stipulation Agreement. Hecker further testified that he thought Minton actually received the full payment of the $26,000.00. However, he also admitted that he does not recall whether

7

he wrote her a check or how that sum was paid.

While Hecker admitted owing Minton the $19,000.00 Lump Sum Payment referenced in paragraph 10, he denied that it was for support arrears. Further, Hecker testified that at the time the Stipulation Agreement was signed, he thought that he did not have to pay Minton the $19,000.00 directly. He testified that he thought Minton was taking the money he owed her directly out of the BB&T account that held the proceeds from the sale of the Maryland property. Additionally, Hecker stated that he thought that Minton was making disbursements to herself directly from the account to satisfy the Lump Sum Payment because she was making disbursements for other debts directly out of the account. Hecker further testified that he never saw an accounting from the BB&T account, and he claimed he was not aware the money had not been taken out of the account until he saw Minton's accounting spreadsheets in either April or May of 2003. Also, Hecker stated that, sometime prior to the signing the Divorce Decree, he had a conversation with Minton about the Lump Sum Payment and learned Minton had not written herself a check to satisfy this obligation. Furthermore, Hecker testified that at the time he endorsed the Divorce Decree in June 2003, while he knew the Lump Sum Payment had not been paid, he believed he had paid all the child and spousal support arrears except for child support for the months of April, May and June 2003, which accrued after the execution of the Settlement Agreement.

The Divorce Decree, entered by the Circuit Court for the City of Chesapeake, Virginia, on June 4, 2003, does not provide for the Lump Sum Payment; however the Lump

8

Sum Payment is addressed in the "Attachment to Final Decree of Divorce" (the

"Attachment"). Pl. Ex. 2. The Divorce Decree recites Hecker's obligations regarding future

child support, and lists past due and owing child arrears as $7,500.00, which specifically

represented payments due for the months of April, May and June 2003. The Attachment does

not label the $19,000.00 as either support or as property distribution. Rather, the language

in the Attachment simply states, "the Defendant is in arrears the payment of the following

Court ordered obligations to the Plaintiff." The Attachment then lists the arrears as $405.00

for "reimbursement for uninsured medical/dental expenses;" $19,000.00 "lump sum payment

due Jan. 22, 2003 from Defendant to Plaintiff;" and $627.12 "interest on $19,000 lump sum

payment." The Attachment also required Hecker to pay Minton's attorney $2,300.00 within

60 days of June 4, 2003. Finally, the Attachment postponed any show cause action by

stating, "the pending show cause against the Defendant and any finding of contempt thereon,

is held in abeyance for 60 days of June 4, 2003."

　　　Currently, Hecker is behind in child support payments that have accrued since the

Divorce Decree was entered, and he continues to have trouble meeting the $2,500.00 monthly

child support payment. After his consulting company started to miss payroll payments, he

sought other work, and eventually became a real estate agent in March 2003. His salary

decreased substantially as a result of the change in employment. While Hecker admits child

support arrearages have accrued since the signing of the Divorce Decree, he denies the

amount of arrearages alleged by Minton in her Complaint. Regardless of the amount, both

9

parties agree that Hecker filed for a reduction in child support payments in state court at approximately the same time he filed his bankruptcy case. The actual amount of child support arrears that accrued since the divorce is still being disputed in state court; however, both parties have stipulated that the child support arrears, subject to a determination by the state court, are nondischargeable. Hecker did not list the child support arrears that accumulated after the Divorce Decree was entered on his bankruptcy schedules; nevertheless, since he agreed to stipulate that they were nondischargeable, this Court need only examine child support with regard to its impact on whether the contested Lump Sum Payment was for support.

## III.
## ARGUMENTS

Minton argues that the Lump Sum Payment was intended as support arrears and is not dischargeable under §523(a)(5) of the Bankruptcy Code. Hecker argues that the $26,000.00, listed in paragraph 14 of the Stipulation Agreement, and admittedly satisfied by the $19,391.00 Payment, covered all past due support arrears, and that the Lump Sum Payment is a debt distinguishable from support and therefore dischargeable.

Minton contends that the Lump Sum Payment is not dischargeable because Hecker was $45,000.00 in arrears for support at the time of signing the Stipulation Agreement, and that the Lump Sum Payment, along with $26,000.00 mentioned in paragraph 14 of the Stipulation Agreement, was intended to cure the support arrearages. Minton's counsel argued that the Stipulation Agreement was drafted with the $45,000.00 split into two separate

10

paragraphs, rather than one lump sum, as part of a compromise between Minton and Hecker. Minton's counsel suggested that Minton was willing to accept $26,000.00 and $19,000.00 as two separate payments, rather than require a lump $45,000.00 for arrears, because she thought giving Hecker protection from contempt proceedings would make him willing to negotiate and actually pay the entire arrearage amount. Additionally, Minton's counsel argued that the Lump Sum Payment was intended as support arrears because paragraph 10 of the Stipulation Agreement stated that the $19,000.00 would not be dischargeable in bankruptcy, and referenced to paragraph 18, which included language about the parties' mutual intent to treat the liability as debts to a spouse. Minton's counsel also asserted that at the time of the Stipulation Agreement, Hecker was in a better financial position than Minton, because at that time, Minton had just assumed the mortgage on the Virginia residence and was pursuing becoming a Certified Public Accountant. Further, Minton's counsel argued that the use of the word "arrears" in the Attachment to the Divorce Decree suggests that the state court Judge intended the $19,000.00 to be classified as support.

Conversely, Hecker argued that the Lump Sum Payment was not intended as support arrears. As previously noted, Hecker admitted that at the time he signed the Divorce Decree in June 2003 that he knew the contested Lump Sum Payment had not been paid; however, he argued that he thought he was fully current on his child and spousal support obligations except for the $7,500.00 in child support due for April, May and June 2003 referenced in the Divorce Decree. He argued that the $26,000.00 payment was intended to cover support, and

11

that the $19,000.00 was not for support but rather to cover unpaid bills and Minton's lawyer

fees. Further, he argued that the parties waived spousal support because Minton was about

to marry David Minton ("Mr. Minton"), and that it was his understanding that Mr. Minton's

company, Freedom Contracting, was doing very well financially. Additionally, Hecker's

counsel argued that the language of the Stipulation Agreement stating that the $26,000.00

was in full satisfaction of the support arrears shows that the Lump Sum Payment could not

have been intended as support. Hecker further argued that the reference regarding the

$26,000.00 payment in paragraph 14 "solely as child support" was for tax purposes, and that

paragraph 14 was intended to cover and be in full satisfaction of child and spousal support

claims. Finally, Hecker's counsel also argued that the language in paragraph 10 stating that

the $19,000.00 is not dischargeable in bankruptcy was merely boilerplate language.

## IV.
## CONCLUSIONS OF LAW

One of the greatest benefits bankruptcy offers a debtor is the opportunity for a fresh

start. Because of the overriding policy of affording a debtor a fresh start, Congress created

only a limited number of exceptions to the dischargeability of debts in bankruptcy. *Brunson*

*v. Austin (In re Austin),* 271 B.R. 97, 105 (Bankr. E.D. Va. 2001). One of those limited

exceptions is § 523(a)(5), which "departs from the general policy of absolution or fresh start

in order to 'enforce an overriding public policy favoring the enforcement of familial

obligation.'" *Robb-Fulton v. Robb (In re Robb),* 23 F.3d 895, 897 (4th Cir. 1994) (quoting

*In re Sampson,* 997 F.2d 717, 721 (10th Cir. 1993)). While "courts have ruled that

12

exceptions from discharge for child and spousal support deserve a liberal construction since the policy underlying § 523(a)(5) favors enforcement of support obligation over a debtor's fresh start," *Garza v. Garza (In re Garza),* 217 B.R. 197, 200 (Bankr. N.D. Tex 1998), this does not mean that debts are automatically treated as being in the nature of alimony, maintenance or support. Rather, the objecting party, who is challenging the dischargeability of the debt "bears the burden of establishing that the award was in the nature of alimony, support or maintenance and is therefore nondischargeable." *Ewing v. Ewing (In re Ewing),* 180 B.R. 443, 446 (Bankr. E.D. Va. 1994) (citing *Tilley v. Jessee,* 789 F.2d 1074, 1077 (4th Cir. 1986); *see also Tilley,* 789 F.2d at 1077 (noting that "[t]he analysis of dischargeability under section 523 must begin with the assumption that dischargeability is favored under the Code unless the complaining spouse, *who has the burden of proof,* demonstrates that the obligation at issue is 'actually in the nature of alimony, maintenance or support'") (citing *In re Morris,* 10 B.R. 448 (Bankr. N.D. Iowa 1981)). Additionally, the plaintiff must demonstrate that the debt was intended to be in the nature of support and maintenance by a preponderance of the evidence. *In re Ewing,* 180 B.R. at 446 (citing *Grogan v. Garner,* 498 U.S. 279 (1991)).

The determination of whether the debt is for support is for the bankruptcy court to ascertain, as the general rule is that whether a debt is in the nature of support is a matter of federal bankruptcy law. *In re Austin,* 271 B.R. at 105 (citing *Long v. West (In re Long),* 794 F.2d 928, 930 (4th Cir. 1986)). Furthermore, "the bankruptcy court must make an

13

independent determination of what constitutes alimony, maintenance or support." *In re Taylor*, 252 B.R. 346, 352 (Bankr. E.D. Va. 1999). However, while federal law controls, state law should not be ignored, as "the parties' intent controls whether the obligation is in the nature of support or is a property settlement." *In re Austin*, 271 B.R. at 106; *see also In re Taylor,* 252 B.R. at 352; *In re Crosby,* 229 B.R. 679, 681 (Bankr. E.D. Va. 1998) (commenting that "[w]hether payments are 'in the nature of alimony, maintenance, or support' is determined by the intention of the parties" (citing *In re Long*, 794 F.2d at 931)); *Grasmann v. Grasmann (In re Grasmann)*, 156 B.R. 903, 908 (Bankr. D.S.C. 1992) ("What guides the bankruptcy courts in deciding whether marital obligations imposed by a judicial decree are nondischargeable alimony, maintenance or support ... is the intent of the state court in fixing the obligation and the purpose of the obligation in light of the parties' circumstances at the time.").

Determining intent is often quite a difficult task, especially in cases like the present one, where the Stipulation Agreement is convoluted and the parties' testimony is conflicting. In determining intent, courts consider four general factors: (i) evidence of overreaching; (ii) the actual language and substance of the agreement; (iii) the financial circumstances of the parties at the time of the agreement; and (iv) the function of the obligation at the time of the agreement. *Catron v. Catron (In re Catron)*, 164 B.R. 912, 919 (E.D. Va. 1994), *aff'd*, 43 F.3d 1465 (4th Cir. 1994); *In re Austin*, 271 B.R. at 106 (citing *In re Crosby*, 229 B.R. at 681).

14

A.
Evidence of Overreaching

At the outset, the Court can dismiss the first factor as inapplicable. There is simply

no evidence of overreaching in the evidence that was presented to the Court. At the time of

entering into the Stipulation Agreement, each party was represented by an attorney, neither

party testified to grossly unfair bargaining power of the other, and the terms of the agreement

do not appear to vastly favor one spouse over the other spouse. *See In re Catron*, 164 B.R.

at 919 (listing factors that suggest overreaching) (citing *Kettner v. Kettner*, No. 91-587-N,

1991 WL 549386 (E.D.Va. Nov. 19, 1991)).

B.
Actual Language and Substance of the Agreement

The second general factor, the language and substance of the agreement in the instant

case is quite complex because of the structure of the agreement. In determining how to

interpret the language of the agreement, courts look to many factors, including whether the

agreement labeled the payments as alimony or property settlement, whether the agreement

was drafted by an attorney, and whether the agreement is "well structured with separate

provisions detailing spousal support and property rights." *In re Catron*, 164 B.R. at 919

(quoting *Kettner,* 1991 WL 549386, at *1); *see, e.g.*, *In re Crosby*, 229 B.R. at 681.

Although not controlling, "the label assigned to a particular payment is a significant

factor." *In re Catron*, 164 B.R. at 919 (quoting *Kettner*, 1991 WL 549386, at *1).

Additionally, "[w]here there is well structured drafting that purports to deal with separate

15

issues in totally distinct segments of the document, a party with the burden of proving non-dischargeability must overcome a substantial obstacle in respect to those segments ...." *Kettner,* 1991 WL 549386, at *1 (citing *Tilley,* 789 F.2d at 1077-78). However, while *Tilley* stands for the proposition that the structure of an agreement is a significant factor, the court in *Tilley* was careful to clarify that "[t]he substance of the agreement rather than the terms affixed to it controls the nature of the obligation." *Tilley,* 789 F.2d at 1077.

In this case, interpreting the meaning and parties' intent regarding the Lump Sum Payment is a complicated and difficult task. First, examining the *Tilley* case as a model for determining intent, the Settlement Agreement in the instant case is more ambiguous than the *Tilley* agreement. *Id.* at 1078 (noting "one member of the panel observed at oral argument, if this agreement does not reveal an intent to separate alimony from property settlement, it is virtually impossible to envision a written agreement that could do so."). Secondly, this case can be differentiated from *Tilley* in that the evidence in this case is more ambiguous and conflicting. *Id.* Therefore, the terms of the Stipulation Agreement are not conclusive in making a determination of the nature of the debt, and this Court must examine the structure of the Stipulation Agreement as a factor in ascertaining whether the Lump Sum Payment was intended as support. *Id.* at 1077 (noting that while the intent of the parties controls, it does not "preclude an examination of a written agreement as persuasive evidence of intent."). Similarly, while the Stipulation Agreement in the present case is not as clearly structured as the one in *Tilley,* the Stipulation Agreement, like in the case of *Tilley*, does reflect structured

16

drafting that is hard to overcome or explain. *See id.* at 1078 (stating that while the written

agreement is not "determinative on the issue," it can "erect[] a substantial obstacle").

The language of paragraph 14 of the Stipulation Agreement creates what this Court

believes is a "substantial obstacle" to Minton's contention that the mutual intent of the parties

was to consider the Lump Sum Payment as support. In paragraph 14, the parties state that

the immediate payment by Hecker to Minton of $26,000.00 was in full satisfaction of the

existing pendente lite child and spousal support claims by Minton. Further, the parties

waived spousal support in paragraph 1 of the Stipulation Agreement. Therefore, the

language of paragraph 14, coupled with the language waiving support in paragraph 1, implies

the mutual intent of the parties was that the $26,000.00 payment covered all support arrears.

Thus, one possible explanation of the Lump Sum Payment is that by specifically addressing

that sum in paragraph 10, rather than in paragraph 14, the parties intended it to be construed

as something different from a support payment.

However, Minton argued that the parties intended the Lump Sum Payment, discussed

in paragraph 10, to be in the nature of support. Minton's counsel urges that paragraph 10

specifically refers to paragraph 18, which discusses the parties' mutual intent to consider

obligations and liabilities assumed in the agreement as nondischargeable debts to a spouse

for alimony, maintenance, or support. Conversely, Hecker's counsel argued that the

language in paragraph 10 was nothing more than boilerplate language. However, this type

of language, stating that the debt is not dischargeable, even if boilerplate, has been found to

17

implicate a shared intent that the debt was intended to be in the nature of support. *Tope v. Tope*, 7 B.R. 422, 426 (S.D. Ohio 1980) (noting that while it did not consider the husband agreeing to such terms "a waiver of his right to a discharge, [it did] consider his agreeing to that term as evidence that he wanted the obligation to be in the nature of support."); *see also Hughes v. Hughes*, 164 B.R. 923, 927 (E.D. Va. 1994) (noting that the language articulated that the purpose of the challenged obligation was to provide for support). Nevertheless, this Court feels the present case is distinguishable. As far as this Court can determine, those cases did not have agreements with a provision that discussed support in such encompassing words as "in full satisfaction of existing pendente lite child and spousal support claims" as found in paragraph 14 of the Stipulation Agreement.[8] For example, it appears that in *Hughes* there was additional language, such as "except for the other provisions," to indicate that while the wife had waived support in one paragraph, the parties still intended sums contained in the other provisions of the agreement to be for support. *Id.* In comparison, in the Stipulation Agreement, the language in paragraph 14 provided for support in totality and did not incorporate any "except for" or similar language into the paragraph. Furthermore, the instant case appears distinguishable based on the fact that the language in paragraphs 10 and 14 of the Stipulation Agreement are inapposite. The Stipulation Agreement provides strong language with the "in full satisfaction" of all existing support obligations phrasing, which is

---

[8] This Court does not have the full records of the other cases in front of it; rather, the Court can only rely on the provisions of agreements quoted in past opinions when comparing the language and interpreting agreements in prior cases. Therefore, the Court is unable to directly compare the language of the agreements in other cases to the present Stipulation Agreement.

distinguishable from an agreement that uses "mutual intent" language in various paragraphs
to imply that the parties' intended for more than one paragraph in the agreement to be in the
nature of support. Therefore, while the non-dischargeability language in paragraph 10 does
taken alone imply the parties intended the $19,000.00 as support, the "in full satisfaction"
language in paragraph 14 "reveals a reason not to" overemphasize the language in paragraph
10 since it conflicts with other text in the agreement. *In re Catron*, 164 B.R. at 917 ("If the
parties to an agreement are willing to set forth clearly, and to acknowledge in writing, the
mutual intent which they hold in making an agreement, the courts, in interpreting the
agreement, must take them at their word, *unless the remainder of the text of the agreement
reveals a reason not to do so.*") (emphasis added).

Thus, this Court believes that the Lump Sum Payment in paragraph 10 is
distinguishable in its nature from support given its separation from the $26,000.00 listed as
support arrears in paragraph 14; however, the Court also notes that paragraph 10 does
strangely refer to the non-dischargeability language in paragraph 18. Taken alone the non-
dischargeability language in paragraph 10 may have persuaded this Court of the parties'
intent; however, taken in the context of the "in full satisfaction" language in paragraph 14
and the waiving of support in paragraph 1, this Court feels that the language in paragraph 10
is in direct contradiction with other provisions of the Stipulation Agreement. Therefore,
while there is some ambiguity in the language of the Stipulation Agreement regarding
whether the parties intended the Lump Sum Payment to be for support arrears, this Court

19

believes that overall paragraph 14, with its "in full satisfaction of existing pendente lite child and spousal support claims" language, creates a "substantial obstacle" for Minton.

Additionally, while the Attachment to the Divorce Decree discusses the $19,000.00 in terms of arrears, it is impossible to infer the intent of the parties from that term alone. Minton's counsel argued that the use of the word "arrears" suggests that the state court Judge intended the Lump Sum Payment to be classified as support arrears. However, since this Court does not have any records from that proceeding besides the Divorce Decree, and the attorneys who drafted the Stipulation Agreement are not the same attorneys representing the parties in this present adversary proceeding, this Court is unable to draw such an inference. Further, it is unclear who actually drafted the Attachment.

C.

Financial Circumstances of the Parties at the Time of Agreement

The third factor deals with the parties' individual financial situations at the time of the agreement. Courts have considered various factors in determining parties' financial circumstances, and therefore, whether an obligation was intended to be in the nature of support. Some of the numerous factors courts consider in determining parties' financial circumstances, include work experience, physical health, and potential earning power and business opportunities. *Austin v. Brunson (In re Austin)*, 271 B.R. 97, 108 (Bankr. E.D. Va. 2001); *see Bedingfield v. Bedingfield (In re Bedingfield)*, 42 B.R. 641, 647 (D. Ga. 1983) (noting that bankruptcy courts should consider "the relative earning power of the parties, their financial status, prior work experiences or abilities, other means of support and other

20

facts relevant to the *substance of the result* achieved by the obligation"). Courts also consider such factors as the "stability of the income of the spouses," and which spouse has custody of minor children. *In re Catron,* 164 B.R. at 919 (quoting *Kettner,* 1991 WL 549386, at *2).

In the present case, the evidence regarding the parties' financial situation at the time of the agreement is conflicting and difficult to interpret. The parties testified that at the time of their separation in November, 1998, Minton was a stay at home mother, and Hecker was a partner in a management consulting business. They also testified that at the time of the separation, Hecker moved out of the family residence, and Minton remained in the home with the three children. Initially, as part of the separation, the parties agreed that Hecker would pay spousal support. However, the company that Hecker was a partner in started having payroll problems and Hecker fell into arrears. In the Stipulation Agreement both parties waived future spousal support. The parties' testimony was conflicting as to why support was waived and when Mr. Minton moved into the residence with Minton. Hecker testified that he thought support was waived because Minton was marrying Mr. Minton. Minton testified that, while she does not remember the exact date Mr. Minton moved in, it was in the fall of 2003, and that she did not get remarried until September 17, 2004.[9] In addition, at some point after the parties separated, Milton started working toward becoming a Certified Public

---

[9] Hecker attempted to introduce documents suggesting that Mr. Minton moved into the residence in 2001; however, the documents were not produced during discovery, and the Court sustained the objection to the use of the documents and denied the introduction of said documents at the hearing because they were untimely.

21

Accountant and somehow got involved with Mr. Minton's business, Freedom Contracting.[10]

It should be noted, according to Minton's testimony, her waiving of support was unrelated

to her relationship with Mr. Minton or his business; rather she implied that waiving it was

part of the agreement that Hecker would pay $2,500.00 a month in child support and cure

arrears.

There was also conflicting testimony presented in regard to the Virginia and Maryland

property, and which party, if either, benefitted from the transactions surrounding those

properties. As stated, after the parties' separation, Minton continued to live in the Virginia

home. She eventually refinanced the house in her name only. She testified that at the time

she refinanced the house that there was negative equity in the house. Conversely, Hecker

claims that there was positive equity in the Virginia home, and testified that the total

value of the home was around $450,000.00 when she refinanced, and that he believed that

Minton refinanced it for approximately $300,000.00. Further, he testified that the equity in

the house would have been somewhere around $150,000.00 to $200,000.00.

As to the Maryland property, there was also conflicting testimony. The parties both

testified that the two properties were not intended to be an equal property exchange and that

Minton controlled the BB&T account that held the proceeds from the sale of the Maryland

---

[10] Hecker attempted to introduce the Articles of Incorporation filed by Freedom
Contracting. The Court sustained the objection to the documents because the documents were
not produced during discovery or in a timely manner. Minton testified that she was not a partner
in the business, however, it was unclear from her testimony the exact nature of her employment.

property. The parties' testimony and Stipulation Agreement implied that Hecker was to receive the proceeds from the sale of the Maryland property, but only after Minton used some of the money to pay certain debts, such as credit card bills. Minton testified that she used a portion of the $94,000.00 proceeds to pay off various debts, including Hecker's Visa and First Union debt. Conversely, Hecker argues that while he had specifically incurred some of those debts, the accounts were joint accounts and both he and Minton incurred some of the expenses on the accounts. Minton also testified that from the BB&T account, she wrote Hecker two checks for a combined total of approximately $44,000.00, and that she wrote herself a check for $19,381.00 to cure some of the alleged arrears. Minton further testified, that except for reimbursing herself for past debts, none of the proceeds from the sale of the Maryland property went to her.

In addition, she testified that as part of the Stipulation Agreement, Hecker was required to pay the taxes on the proceeds from the sale of the Maryland property. She also testified that Hecker did not pay said taxes and that the Internal Revenue Service ("IRS") claims it can still pursue her for the debt. Hecker did not testify about the IRS debt, nor was it addressed, or even alluded to, in Minton's Complaint. Hecker testified that he used the proceeds Minton gave him (the $44,000.00) to pay child support and to purchase a parcel of property for approximately $11,000.00 or $12,000.00. Minton's counsel argued that Hecker received more than $44,000.00 from the proceeds, and that Hecker actually received everything but the $19,391.00 Payment that Minton kept and the amounts allotted to past

23

bills and arrears.

After examining all of the amounts that were paid out of that BB&T account, this

Court calculates that there would have been very little remaining of the $94,000.00 to give

to Hecker, besides the $44,000.00.[11] This Court recognizes that Hecker probably benefitted

from the $94,000.00 beyond the $44,000.00 that he received, because it is clear from the

financial evidence presented to this Court that a portion of the $94,000.00 was used to pay

Hecker's debts and past due arrears. Additionally, this Court is confused as to why Hecker,

who claims he was in a poor financial condition, spent approximately $11,000.00 or

$12,000.00 to buy property and rebuild equity at a time when he was allegedly behind on his

support payments. Nevertheless, from the evidence presented, this Court does believe

Hecker was struggling financially around the time of the Separation Agreement and Divorce

Decree, especially in light of his career change around that time.

Additionally, this Court recognizes it must have been difficult financially for Minton

when Hecker fell behind on his support payments. However, this Court is at a loss as to why

Minton would give Hecker, who was having financial troubles and thus in arrears on his

---

[11] After adding up the various bills and expenditures that were allegedly paid out of the
$94,000.00, this Court is not sure that there was much remaining for either party to have claimed.
The expenditures that supposedly were deducted from the $94,000.00 include $1,997.00 for a
mortgage payment; $2,200.00 and $2,000.00 in October of 2002 for bills; the approximately
$44,000.00 given to Hecker; $9,942.00 to First Union; $4,000.00 to a Visa bill; $19,381.00 for
past due arrears; and $3,137.00 for reimbursement to Minton for paying Hecker's bank or credit
card charges. There was also some evidence presented that suggested that Minton wrote herself a
check for $7,500.00 from the proceeds to cover past due child support. The aforementioned
deductions result in a combined sum of approximately $94,000.00.

child and spousal support, a significant amount of the proceeds from the sale of the Maryland

house. If her financial situation was so dire that she was willing to make concessions in

order to secure the payment of arrears, it is confounding for the Court to understand why she

would write checks to Hecker from an account over which only she had control. It is

especially difficult to understand why Minton gave Hecker, who allegedly owed $45,000.00

in arrears and whose career was in fluctuation, approximately $23,802.00 just days before

the parties entered into the Stipulation Agreement and approximately $20,600.00 just days

after entering into the Stipulation Agreement. Additionally, at the time the Stipulation

Agreement was signed, not only did Minton control the BB&T account, but the Virginia

home had been refinanced in her name only. Therefore, while the testimony is conflicting

as to the parties' financial situation at the time of the Stipulation Agreement, it appears

Minton was in a better financial position than she would have this Court believe, especially

given her control of the BB&T account and her surprising willingness to write Hecker two

substantial checks when arrearages allegedly existed.

### D.
### Function of the Obligation at the Time of the Agreement

The fourth factor examines the role the obligation was intended to perform at the time

the parties entered into the Agreement. In determining the function of the obligation, courts

often consider whether the contested obligation serves to provide necessities, such as food,

clothing, and shelter. *In re Catron*, 164 B.R. at 919 (citing *Kettner*, 1991 WL 549386, at *2).

Additionally, in determining whether an agreement was intended to function in the nature of

25

support, "the court may also examine the statements of the spouses in determining the purpose for which payments are intended." *Id.* (quoting *Kettner*, 1991 WL 549386, at *2). Other relevant variables include whether there was a need for support, characterization of the debt under state law, duration of marriage, and financial resources of each spouse. *Peterson v. Peterson (In re Peterson)*, 133 B.R. 508, 513 (Bankr. D. Mo. 1991) (listing factors that courts have considered).

The function of the obligation in the instant case is ambiguous. Examining the Stipulation Agreement, Divorce Decree, and parties' testimony does not cure the ambiguity, nor does it fully explain the nature of the obligation. The determination of "the nature of an obligation involves an ad hoc inquiry." *Gianakas v. Gianakas (In re Gianakas)*, 917 F.2d 759, 764 (3rd Cir. 1990). In performing an ad hoc inquiry, this Court starts by examining the Stipulation Agreement. Certainly, the language in paragraph 14 referencing "full satisfaction" of existing support claims by payment of the $26,000.00 suggests that the Lump Sum Payment in paragraph 10 could not have been intended to function as support. However, this Court is also cognizant of the fact that courts must look beyond the labels when determining the purpose of an obligation. *Garza v. Garza (In re Graza)*, 217 B.R. 201, 201 (Bankr. N.D. Tex.1998) (noting that courts must "look behind the label and determine the true nature of the obligation").

In the present case, Minton's counsel argued that the intended function of the Lump Sum Payment was to cure the support arrears, and he argued that the $19,000.000 was put

26

in a separate paragraph from the $26,000.00 as part of a compromise wherein Minton waived

the right to seek a contempt sanction in order to ensure Hecker paid his arrears.  Minton's

counsel in this adversary proceeding is different from the attorney who drafted the

Stipulation Agreement; therefore, it is difficult for the Court to access the rationale of the

drafting attorney, especially since neither party testified to this theory of trading payment for

protection from future contempt proceedings.  In addition, after examining the language of

the Divorce Decree, this Court finds the argument regarding the contempt proceedings

unpersuasive.  The Attachment to the Divorce Decree did hold contempt proceedings in

abeyance, but only for 60 days.  The Attachment stated that if the arrearages were not cured

within 60 days, "the Plaintiff is to place this matter [the contempt proceeding] on the Court's

docket."  Pl. Ex. 2.  Such language suggests the agreement as to the Lump Sum Payment was

not in an outright response to waiving the right to seek contempt, because the Divorce Decree

specifically stated that right would be reinstated within 60 days.

The parties' testimony was conflicting in many regards, not only with each other's

testimony, but also in regard to the factual evidence and their own testimony.  Minton argued

that the Lump Sum Payment was intended as support; however, on her Year 2003 financial

spreadsheet (submitted as Plaintiff's Exhibit 3), she labeled the $19,000.00 as "Loan Bal"

and also labeled the interest on the $19,000.00 as "Loan interest."[12]  Hecker argues the Lump

---

[12] This Court was only given Minton's "Year 2003" financial records.  The records begin
in January 2003 and end in July 2005.  The Court would have been interested to see records from
1998 through 2002 to determine how, and if, spousal support arrears accrued and were accounted
for; however, those records were not offered to the Court.

Sum Payment was not intended for support; however, he testified the Lump Sum Payment

was for bills and legal fees and that it was his understanding that the language in paragraph

18 meant that the sum would be exempted from discharge and non-dischargeable.[13]

Hecker's testimony that the $19,000.00 was for bills and his understanding of paragraph 18

does, taken in a vacuum, suggest that the function of the obligation may have been for

support. However, in light of the totality of circumstances, including the conflicting

testimony about the parties' financial status at the time of entering the Stipulation Agreement,

the odd exchange of money between the parties around the time of the Stipulation

Agreement, and the conflicting provisions in the Stipulation Agreement, this Court is unable

to conclusively decide the intended function of the Lump Sum Payment.

E.

Summary of Factors

The facts in the present case are contradictory and ambiguous at best, which makes

it difficult for this Court to determine the intent of the parties. In determining intent, courts

are required to do a factual analysis of all the relevant factors, as "[i]ntent is determined in

light of all the circumstances." *Kettner*, 1991 WL 549386, at *1; *see also Taylor v. Foiles*

---

[13] It should be noted that this Court also examined the Schedules Hecker filed in his
November, 2004 bankruptcy case. Hecker listed Christina Hecker [Minton] on his Schedule F,
as a creditor holding unsecured nonpriority claims. He listed the claim as "2003 lump sum
payment/interest" and the amount of the claim as "$23,800.00." This Court finds this labeling of
the claim irrelevant, both because the label offers no evidence of the intended function of the
debt and because it does not offer any insight of the intent of the parties or the intended function
of the debt since the bankruptcy occurred over a year after the Divorce Decree was entered.

(*In re Foiles*), 62 F.3d 1414, 1995 WL 463101, at *1 (4th Cir. 1995) (unpublished table

decision) ("The character of a debt arising out of a marital dissolution is primarily a factual

determination."). In making a factual determination and determining whether the nature of

an award was meant to be alimony or support, courts frequently apply a balancing test;

however, there is no specific formula. *Baker v. Baker* (*In re Baker*), 274 B.R. 176, 188

(Bankr. D.S.C. 2000) (quoting *Anderson v. Anderson* (*In re Anderson*), C/A No.

96-79651-W; Adv. Pro. 97-80170-W, 1997 WL 33344287 (Bankr. D.S.C. Dec. 9, 1997))

("Each case under Section 523 is fact intensive and distinguishable from other cases. In

discerning whether an obligation is in the nature of support[,] courts have utilized a litany of

factors, and while one factor may be determinative in one case, it may be of no consequence

in another."); *see also In re Catron*, 164 B.R. at 919 (commenting that "there is no uniformly

accepted calculus to make the determination of whether such debts are dischargeable.").

     In determining whether the Lump Sum Payment should be dischargeable, this Court

examined both the structure of the Stipulation Agreement and the evidence presented. As

previously mentioned, the structure of the Stipulation Agreement contains contradictory

provisions. The language in paragraph 10 of the Stipulation Agreement providing that the

Lump Sum Payment is "not dischargeable by Husband in bankruptcy" seems to have

designated the obligation as support; however, that provision appears to this Court to be in

direct contradiction with paragraph 14 and the language providing that payment of the

$26,000.00 (which was voluntarily reduced to $19,391.00) fully satisfied all existing support

claims. Similarly, while paragraph 14 suggests the parties intended for paragraph 10 to be something other than support, there is no indication in paragraph 10 of what the Lump Sum Payment was intended to be for if it was not intended as support. Therefore, this Court, after evaluating the structure of the agreement, the parties' testimony, the parties' financial situation at the time of the Stipulation Agreement, and the parties' arguments regarding the intended role of the Lump Sum Payment, is unable to conclusively decide if the parties' intent regarding the Lump Sum Payment was for the monies to constitute support.

Examining all of the factors suggests both parties' arguments have severe flaws. This is not a situation where all of the factors conclusively balance to one side of the equation. Rather, the Court was forced to weave its way through a contradictory Separation Agreement, conflicting evidence, conflicting testimony, and testimony that conflicted with the written evidence, in an attempt to give the proper credence to all of the variables. While this Court recognizes certain facets of the evidence and testimony suggest that the Lump Sum Payment may have been in the nature of support arrears, this Court was unable to find any ascertainable reason for the obvious contradictions to the Lump Sum Payment being in the nature of support, such as why the $19,000.00 was put in a separate part of the agreement; why the Lump Sum Payment was intended as support when the Separation Agreement expressly in paragraph 14 thereof represented the support arrearages to be in the amount of $26,000.00, an amount which was satisfied by the $19,391.00 Payment; why Minton gave Hecker money when he allegedly owed her support arrearages; or why she labeled the Lump

30

Sum Payment as a loan on her 2003 financial spreadsheets.  In the end, the Court is not

entirely sure what the Lump Sum Payment was intended to be for, and the burden ultimately

rests with Minton to persuade the Court that it was intended to be in the nature of support.

*See Tilley*, 789 F.2d at 1077 (noting that the complaining spouse has the burden of

demonstrating that the contested debt is "actually in the nature of alimony, maintenance or

support").  Therefore, the Court, weighing the facts, finds that the Lump Sum Payment was

not proven by a preponderance of the evidence to be in the nature of support under

§523(a)(5).

A separate order will issue.

The Clerk shall deliver copies of this Memorandum Opinion to Michael L. Donner,

Esquire, Counsel for the Plaintiff, and Gary B. Allison, Esquire, Counsel for the Defendant.

Entered:         11/21/05

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

NOTICE OF JUDGMENT OR ORDER
Entered on docket NOV 2 1 2005

31